# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DINO P. GIORDANA,

        Plaintiff,

    v.                            Case No. 05-C-1354

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

## DECISION AND ORDER

This is an action for judicial review of the final decision of defendant Commissioner of Social Security ("Commissioner") to deny plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 401 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* Plaintiff claims that the Commissioner's decision is not supported by substantial evidence and is contrary to law. For the following reasons, the decision of the Commissioner will be affirmed.

## BACKGROUND

Plaintiff Dino P. Giordana, then age 44, filed applications for DIB and SSI on July 22, 2003. (Tr. at 56-58, 178-81.) He alleged he became disabled on June 25, 2003, due to the residual effects of a skull fracture and concussion stemming from a 1995 motorcycle accident, which effects included depression, memory loss, headaches, and paranoia. (*Id.* at 70, 77, 86, 109.) Prior to the alleged onset of his disability, plaintiff worked as a sales manager, apartment manager, car rental

agent and manager, die maker, and stock clerk. (*Id.* at 71.) He had also completed one year of college at St. Norbert College in De Pere, Wisconsin, but left because "he got a good summer job and was making a lot of money." (Tr. at 158.) He later obtained a real estate license. (*Id.* at 76.) Plaintiff's marriage ended in divorce in 1992; the couple had no children. (*Id.* at 56-57.) In July 2003, following the death of his mother, plaintiff moved in with his father, and since then has worked full-time twice, though neither job lasted more than a few days. (*Id.* at 58, 79, 84.) At the time of the December 2004 hearing before an Administrative Law Judge ("ALJ"), plaintiff only source of income was a newspaper route. (*Id.* at 191-92, 198.)

The Social Security Administration denied plaintiff's applications initially and upon reconsideration (*Id.* at 27, 28.) Plaintiff thereupon requested a hearing, which was held on December 9, 2004, before Administrative Law Judge Ira S. Epstein. (*Id.* at 39, 41, 188.) The ALJ issued a decision on April 19, 2005, finding that the plaintiff was not disabled and therefore not entitled to the benefits sought. (*Id.* at 17-25.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review. (*Id.* at 8.) Plaintiff subsequently commenced the instant action.

The ALJ's review of the medical evidence, as reflected in his decision, began with plaintiff's 1995 motorcycle accident. Plaintiff's medical records indicate he was the driver of a motorcycle involved in an accident in Arizona in March 1995. (*Id.* at 118.) Although he lost consciousness at the accident scene, emergency room records show he was awake and answering questions but complaining of headache. (*Id.* at 118, 121.) Examinations and brain scans revealed the following injuries: an abrasion of the forehead, right periorbital swelling, ecchymosis, basilar skull fracture, a small temporal lobe epidural hemotoma with some peneumocephalus, a zygomatic arch fracture on the right, and a possible orbital floor fracture. (*Id.* at 118, 120, 125.) A subsequent computerized

2

tomography (CT) scan revealed the hematoma was stable. (*Id.* at 118.) He was admitted to the intensive care unit for observation, and remained neurologically stable during his hospitalization. (*Id.*) Hospital staff concluded no surgery was necessary for his facial fractures. (*Id.* at 119.) He was discharged several days later in stable condition with diagnoses of epidural hematoma, facial fractures, and multiple abrasions. (*Id.* at 118-19.)

The record contains no further evidence of medical treatment for this injury or any other condition until after plaintiff filed his applications DIB and SSI in July 2003. On August 12, 2003, Fredric Seldin, Ph.D., performed a psychological evaluation of plaintiff at the request of the Social Security Administration. (Tr. at 134-38.) Plaintiff, accompanied by his father, complained of anxiety attacks, paranoia, and memory impairment. Plaintiff's father described plaintiff as "going down hill since the accident." (Tr. at 136.) He said plaintiff had trouble remembering things and leaves appliances on at home. According to his father, plaintiff had been living with his father and sister over the last seven years, except for the year just previous when he had briefly moved back to Arizona, and was being supported financially by his family. (Tr. at 134, 136.)

Dr. Seldin found no problems with plaintiff's gait, vision, hearing, or receptive or expressive communication skills. Plaintiff reported that on a typical day he would awake at 7:00 a.m., read the newspaper until 8:00 a.m., go to a restaurant with his father for breakfast, visit family friends with his father, and return home where he would read. According to Dr. Seldin, plaintiff also socialized with friends outside of his family and dates. He was able to cook, shop, do laundry, and handle his own money. He had no problem caring for his personal needs, and appeared appropriately dressed and groomed. Plaintiff made good eye contact, was oriented times three, was in good contact with reality, and Dr. Seldin found no signs of delusional thinking or paranoia. His thought processes were adequate and intact, although he had some difficulty following the conversation during the

3

interview and seemed to lose track of the questions he was asked periodically. Plaintiff showed mild agitation and somewhat uncoordinated movements, but he was in control of his bodily movements throughout the exam. Dr. Seldin reported plaintiff was cooperative but related to him in a "pleading," though open and spontaneous, manner. Although his mood was anxious, plaintiff showed no signs of accelerated or slowed thinking. There were no indications of inappropriate affect or flattened or blunted emotions, though he did exhibit a narrow range of emotions. His speech was normal in rate, tone, and inflection. Plaintiff showed adequate remote memory during the exam, but recent and immediate memory were deficient. He was not able to recall any of three objects after a five-minute delay and could only recall four digits forward and three digits backward. His concentration was moderately impaired; however, his abstract thinking was basically intact. Dr. Seldin diagnosed plaintiff with anxiety disorder NOS (not otherwise specified), but ruled out anxiety disorder due to a general medical condition. He gave him a Global Assessment of Functioning (GAF) rating of 65, which reflects only mild symptoms. Regarding plaintiff's work capacity, Dr. Seldin opined that plaintiff could "understand, remember, and carry out simple instructions" although he would have "moderate difficulty" in maintaining concentration, attention, and work pace, as well as in withstanding routine work stresses and adapting to changes in the work place. (Tr. at 137.)

Approximately eight months later, in April 2004, plaintiff underwent a psychiatric assessment at the Outagamie County Human Services Division of Mental Health Psychotherapy Unit by Dr. Dave Jagdish. (Tr. at 157-59.) Dr. Jagdish noted the history of plaintiff's motorcycle accident in Arizona, including his apparent recovery and return to work. According to Dr. Jagdish, plaintiff was working on a computer and had three to four jobs at a time following the accident. (Tr. at 157.) He returned to Wisconsin to live with his father after his mother passed away and thereafter

4

exhausted all of his savings. More recently, Dr. Jagdish noted, plaintiff had been experiencing difficulty remembering recent and immediate events. Plaintiff also reported paranoia and felt that people are watching and talking about him. However, he claimed he had good energy and attended a health club every day. It is unclear from the record what plaintiff did at the health club.

On mental status examination, Dr. Jagdish noted plaintiff had "a peculiar body movement which involves the entire body, but more apparent in the upper extremities." (Tr. at 158.) According to plaintiff, the movement had developed after the motorcycle accident. Dr. Jagdish noted plaintiff's speech was a little hard to decipher, but could be understood. He was alert but only partially oriented as he knew the month as April and the year, 2004, but was not able to recall the current date. He thought it was the twenty-sixth and when told it was three days less, he said it must be the twenty-first. When told it was two days more than the twenty-first, he again repeated the twenty-sixth. He was also unable to name the place of his examination. Plaintiff was able to remember three objects, but could recall none of them when asked to name them a couple of minutes later. Dr. Jagdish also noted plaintiff's concentration and attention span appeared diminished. In Dr. Jagdish's opinion, plaintiff appeared to be honest. (Tr. at 159.)

Based on his examination, Dr. Jagdish diagnosed plaintiff as suffering from a personality change due to secondary medical condition, namely, head trauma with paranoid ideation and memory loss. Dr. Jagdish was uncertain whether psychotropic medication would help with plaintiff's paranoia, given that plaintiff's problems appeared to flow from neurological damage rather than chemical imbalances. Nevertheless, plaintiff was started on Seroquel, a medication that would not increase the involuntary movements plaintiff was already experiencing. Plaintiff's dosage was increased during his follow-up visit in May 2004, when he reported no improvement

5

and complained further of depression. Similarly, in June 2004, Dr. Jagdish again increased the dosage after plaintiff reported continuing paranoid thoughts that others were watching him.

In May 2004 plaintiff saw Michael Werner, M.D., for a complete physical. (Tr. at 166-73.) Plaintiff reported that although he had done well in the past, he had felt for the prior year that people were watching him. At home he would keep his blinds closed so that no one can see inside. He reported no long-term memory problems, but indicated short-term memory issues, noting that he kept at home a list of tasks to complete for the day. He said he was taking medication as prescribed by his psychiatrist, but could not recall the name of his psychiatrist or the location of his office. He reported no physical problems and advised that he exercised on a regular basis and maintained a paper route that garnered him about $400 per month. Physical examination revealed no abnormalities, although Dr. Werner noted plaintiff had some random full-body twitching, and it was unclear whether plaintiff was aware of same. Plaintiff's affect and mood were normal; he was able to follow commands and was appropriate in understanding. Dr. Werner opined that plaintiff's current mental status might be somewhat related to his past brain injury, but he could not explain why the current symptoms had not appeared until years after the accident. Dr. Werner suggested plaintiff follow up with his psychiatrist.

On a follow-up visit a month-and-a-half later, Dr. Werner noted that plaintiff was continuing his job delivering papers and that he was fine if he could remain in the car. When he had to leave his car to make a delivery, however, plaintiff reported he would become extraordinarily more paranoid. He also said he had to write everything down or he would forget where to go and what to do. Dr. Werner described plaintiff as "pleasant" with "some confusion" and "a very poor short-term memory." (Tr. at 167.)

6

Meanwhile, plaintiff was continuing to follow up with Dr. Jagdish. In August 2004, he reported to Dr. Jagdish he was doing better, and was able to go out without feeling people were watching him. (Tr. at 174-76.) He also said he was sleeping better and had a good appetite. He continued to have involuntary movements, but he was maintained on the same medication and dosage. Dr. Jagdish noted plaintiff had some difficulty comprehending but was able to maintain goal-directed conversation. However, he still had to write down simple information, and Dr. Jagdish noted "the patient may be an appropriate subject for Disability." (Tr. at 176.)

Plaintiff was seen again by Dr. Jagdish in October 2004, and reported he was happy with how his medication was working. He said he no longer wished to see a neurologist. He reported he was living with his father and sister without cost, was sleeping well, and his appetite was good. He reported some residual paranoid symptoms, but he said they did not bother him. His attitude was friendly, and he maintained goal-directed conversation. Plaintiff stated he was working a paper route and that if his medication would no longer be provided free, he would have to work two routes. The plaintiff sought medication twice in November 2004, according to Dr. Jagdish's records. When Dr. Jagdish saw plaintiff again in December 2004, plaintiff stated that when he felt anxious and paranoid, he would take an extra pill of his medication. Dr. Jagdish advised him that he would no longer prescribe the medication if plaintiff continued to manipulate the dosage in such a manner. Plaintiff said the medication helped him 80% of the time and had not affected his involuntary movements. At other times, he was still fearful of going out because he felt anxious, nervous and paranoid. Dr. Jagdish noted plaintiff's personal hygiene and grooming were good, as were his sleep, appetite, and mood. His affect was appropriate, but he continued to have some thought blocking, memory lapses, and involuntary movements. Consequently, Dr. Jagdish increased his dosage of the medication.

7

At the hearing before the ALJ on December 9, 2004, plaintiff was unable to state his address without pulling out a piece of paper from his wallet on which he had written his father's telephone number, his sister's telephone number and his address. (Tr. at 194-95.) He testified that he began having problems with his short-term memory two years ago and now had no short-term memory. According to plaintiff, he has to write everything down. (Tr. at 195.) In his last job in Arizona before he moved back to Wisconsin, plaintiff worked as a stock clerk at a Target Store. Plaintiff testified that he was supposed to stock a particular area of the store every night, but had difficulty because he would get lost in the store and could not find the area he was supposed to stock. (Tr. at 195-96.) At another job he had, he could not remember the job from day to day. (Tr. at 196.) He would make a list of the things he was supposed to do on the job every day. Every job had a different sheet that he would use each time. The lists he keeps now, plaintiff testified, are so extensive that he includes even such simple and routine tasks as shaving, brushing his teeth, and showering. His father still has to remind him to do certain things and has taken over all of the cooking since plaintiff forgets to turn off the stove. (Tr. at 197.) Plaintiff said he drives only for purposes of completing his paper route, and carries with him written instructions regarding where to turn. Furthermore, his paper route causes him anxiety when he has to go out in the dark to deliver the papers. Plaintiff stated he does not like to go outside the house, as he feels people are watching him, but he does leave the house to exercise at a gym several times per week. He said he has no friends because he stays home so much. He also gave up reading because his concentration is so bad its takes forever to read anything. (Tr. at 198-200.)

Vocational expert David Ostwald also testified at the hearing. (Tr. at 202-07.) In response to questioning by the ALJ, Ostwald opined that plaintiff could perform several jobs involving only simple, routine, and unskilled labor, and that these jobs existed in significant numbers in Wisconsin.

8

According to Ostwald's testimony, these jobs are laundry worker (2,000 jobs estimated in Wisconsin), light assembly work (8,000-10,000 jobs), and hotel/motel cleaner (1,000 jobs). (*Id.* at 203-04.) Plaintiff's representative at the hearing asked Ostwald how the ability to do these jobs would be affected by various obstacles, such as difficulty in finding the work site, difficulty in finding one's way around a work site, difficulty in getting supplies, and anxiety occasioned by working near other people. (*Id.* at 202-07.) Ostwald responded that difficulty in finding the job site, in navigating once there, or in getting supplies would render one incapable of doing any of the jobs, and that fear of working near others would presumably result in one's not going to work, although all the jobs he described involved only limited contact with others.

The ALJ issued a decision denying plaintiff's application for benefits on April 19, 2005. The ALJ undertook the standard five-step inquiry set forth in 20 C.F.R. § 404.1520. That inquiry requires the ALJ to evaluate, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404[.1520], App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (internal citation omitted). The claimant must prove that he is currently unemployed and that his impairments are severe (steps (1) and (2)). Failure on either step (1) or (2) requires a finding of no disability. 20 C.F.R. § 404.1520(a)(4)(I-ii). If the claimant prevails on steps (1) and (2), he may establish his entitlement to benefits by proving that his impairment meets or equals a listed impairment (step (3)). The claimant's success at step (3) brings the inquiry to an end. 20 C.F.R. § 404.1520(d); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). If the claimant fails at step (3), he must prove that he cannot perform his past relevant work (step (4)). Failure at step (4) requires a finding of no disability. 20 C.F.R. § 404.1520(a)(4)(iv).

9

Even if the claimant succeeds at showing he cannot perform his past relevant work, the Commissioner may establish that the claimant is not disabled by proving that he can perform work in the national economy (step (5)). 20 C.F.R. § 404.1520(a)(4)(v); *Bowen*, 482 U.S. at 146 n.5.

The ALJ found that plaintiff was unemployed and that his impairment was severe, thus satisfying steps (1) and (2). (Tr. at 18.) At step (3), he found that while plaintiff's impairments were severe within the meaning of the regulations, his impairments were not singly or in combination severe enough to meet or equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4 (Social Security Ruling 96-6p). (*Id.* at 21.) The ALJ noted that while plaintiff exhibited some of the features of the criteria listed under part A of impairment listings 12.02 and 12.06, his functional limitations were not manifested to a degree that would satisfy the criteria under part B of those listings. (*Id.*) The ALJ found that plaintiff had only mild limitations with regard to activities of daily living and social functioning; moderate limitations with regard to concentration, persistence, and pace; and showed no evidence of any episodes of extended decompensation. (*Id.*)

Having found that plaintiff did not have an impairment that met or equaled a listed impairment, the ALJ proceeded to step (4) of the inquiry. Based on the medical record and plaintiff's testimony at the hearing, the ALJ determined that plaintiff retains the residual functional capacity for all exertional levels of work and is limited only to simple, low-stress, routine work. (*Id.* at 21-22.) The ALJ noted that he could not find credible plaintiff's allegation that he was incapable of all work activity. (*Id.* at 22.) The ALJ next determined whether plaintiff could perform any of his past relevant work. Based on the testimony of vocational expert David Ostwald, the ALJ found that plaintiff could not return to any of his past relevant work. (*Id.* at 23.) Turning at last to step (5), the ALJ found that, based on the testimony of the vocational expert and considering plaintiff's age, educational background, work experience, and residual functional

10

capacity, plaintiff could successfully adjust to work that exists in significant numbers in the national economy, and thus plaintiff was not disabled under the Social Security Act.  (*Id.* at 23-24.)

## ANALYSIS

In reviewing an ALJ's decision on a claim for Social Security disability benefits, this court may not reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute its own judgment for that of the Commissioner of Social Security; rather, the court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence based on the record as a whole.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); *Johnson v. Heckler*, 741 F.2d 948, 953 (7th Cir. 1984) (internal citation omitted); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").  "Evidence is substantial if it is sufficient for a reasonable person to accept as adequate to support the decision."  *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002) (internal citation omitted).  Despite the deference accorded to the ALJ, however,  a reviewing court must not "simply rubber-stamp the Commissioner's decision without a critical review of the evidence."  *Clifford*, 227 F.3d at 869.  The Commissioner's decision cannot stand if the ALJ fails to build a logical bridge from the evidence to his conclusion.  *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000).  While the ALJ need not provide a "complete written evaluation of every piece of testimony and evidence," *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995) (internal citation omitted), his decision must reflect a fair assessment of evidence and be free of fatal gaps and contradictions.  *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).  Still, a reviewing court must "give the opinion a commonsensical reading rather than nitpicking at it."  *Id.*

11

Plaintiff alleges three primary deficiencies in the ALJ's decision: (1) the ALJ improperly found that plaintiff's impairments did not satisfy the "part B" criteria for impairment listings at 12.02 (organic brain disorders) or 12.06 (anxiety-related disorders); (2) the ALJ improperly assessed plaintiff's credibility; and (3) the ALJ asked the vocational expert a deficient hypothetical question.

## I. Satisfaction of the part B criteria for impairment listings 12.02 and 12.06

As part of his inquiry at step three of the five-step inquiry, the ALJ found that plaintiff met the criteria under part A for impairment listings 12.02 and 12.06, as reflected in the diagnoses of record that plaintiff had a personality change due to an organic brain condition, head trauma, and paranoid type. (Tr. at 21.) However, in order to be considered disabled under step three, a claimant must satisfy all of the criteria in that listing. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). Thus, plaintiff also had to satisfy the functional limitation criteria under part B of 12.02 and 12.06.[1] Under part B (which is identical for listings 12.02 and 12.06), plaintiff must show his "part A" condition has resulted in at least two of the following four limitations: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of extended decompensation. 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.02, 12.06 (2006). The ALJ found

---

[1] Both 12.02 and 12.06 contain criteria under part C, satisfaction of which substitutes for satisfaction of the part B criteria, but plaintiff did not attempt to show satisfaction of part C for either listing. Part C under listing 12.02 requires a "[m]edically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support." 20 C.F.R. 404.1520a, pt. 404, subpt. P, app. 1, § 12.02 (2006). Given that the earliest medically documented mention of plaintiff's impairment is August 12, 2003—less than two years before the ALJ issued his decision—plaintiff did not qualify as disabled under part C. The part C criterion under listing 12.06 requires a "complete inability to function independently outside the area of one's home," which plaintiff has not demonstrated or argued. *Id.* at § 12.06.

12

plaintiff experienced mild restrictions regarding the first two limitations, moderate difficulties regarding the third, and no episodes of extended decompensation regarding the fourth. (Tr. at 21.)

Plaintiff argues that the ALJ incorrectly characterized the plaintiff's limitations in the first three categories as "mild" or "moderate" against the greater weight of the evidence. (Pl. Br. at 6.) Plaintiff contends that the ALJ, when characterizing plaintiff's functional limitations as "mild" or "moderate," failed to weigh adequately Dr. Seldin's finding that plaintiff was "markedly limited" in his ability to understand and remember detailed instructions and in his ability to carry out detailed instructions. (*Id.*) However, this finding was not made by Dr. Seldin as plaintiff argues, but rather by disability assessors. (*See* Tr. at 2 (indicating this assessment was performed by a disability determination services (DDS) physician); Tr. at 140, 142 (showing signatures of examiners and consultants who made the "markedly limited" assessment).) These assessors concluded plaintiff was "markedly limited" in two of eleven sub-areas when rating him on a pre-printed assessment form. However, for the other nine sub-areas in the two categories entitled "Understanding and Memory" and "Sustained Concentration and Persistence," the assessors rated plaintiff "not significantly limited" or "moderately limited." (Tr. at 138-39.) Taking into account all twenty sub-areas in the four categories given on the form, plaintiff was assessed "markedly limited" in only two of twenty sub-areas. (*Id.*) The ALJ's determination that plaintiff was only mildly or moderately limited with respect to the first three of the "part B" criteria certainly finds support in these assessors' conclusions, considering that in nine of eleven sub-areas covering memory and concentration they agreed with the ALJ that plaintiff was not "markedly limited," and that plaintiff was assessed as "markedly limited" in only two of twenty sub-areas altogether. As to the ALJ's failure to address specifically the two "markedly limited" assessments, the ALJ is not required to

13

address every component of the evidentiary record. *See Diaz*, 55 F.3d at 308 (internal citation omitted).

The ALJ's determination that plaintiff failed to meet the "part B" criteria finds support elsewhere in the record. For example, Dr. Seldin noted plaintiff's "significant" short-term memory deficits and his "moderately deficient" concentration, but when summarizing plaintiff's work capacity, Dr. Seldin opined that plaintiff "can understand, remember, and carry out simple instructions. . . . [and] can respond appropriately to supervisors and co-workers." (Tr. at 137.) Dr. Seldin also found that plaintiff would have only "moderate difficulty" in maintaining concentration, attention, or work pace; in withstanding routine work stresses; and in adapting to changes in the work place. (*Id.*) Of course, Dr. Seldin's professional opinion is not at issue. Rather, the issue is whether the ALJ's factual findings are supported by substantial evidence in the record. The ALJ's summary of Dr. Seldin's evaluation indicates that he appropriately considered that evaluation along with the others. The ALJ accurately stated Dr. Seldin's conclusions regarding plaintiff's memory deficits and moderately impaired concentration, as well as Dr. Seldin's opinion regarding plaintiff's work capacity. (*Id.* at 19.) Given that the ALJ *adopted* Dr. Seldin's summary assessment regarding plaintiff's limitations in maintaining concentration, persistence, or work pace (the third functional limitation under part B), plaintiff's argument that the ALJ "ignored" Dr. Seldin's evaluation in this area rings hollow. (*Id.* at 18-19.) Furthermore, the ALJ's determination regarding plaintiff's satisfaction of the part B criteria fully tracks the findings of medical consultants Dr. Jack Spear and Dr. Keith Bauer. (Tr. at 142, 152.)

Plaintiff also claims the ALJ failed to give proper consideration to reports from Dr. Jagdish, the treating physician, who found that plaintiff had short-term memory problems. (Pl. Br. at 6-7; Tr. at 156-59, 176.) Plaintiff correctly points out that a treating physician's opinion, if well

14

supported by other acceptable evidence and not inconsistent with substantial evidence from other sources, is to be given controlling weight. 20 C.F.R. § 404.1527(d)(2) (2006). However, plaintiff has failed to explain how the ALJ's findings contradict Dr. Jagdish's opinion regarding plaintiff's short-term memory deficit. Nor does plaintiff identify the substance of Dr. Jagdish's opinion that is alleged to be controlling (and contradictory to the ALJ's findings). Dr. Jagdish noted plaintiff's difficulty when he attempted to complete several memory tests and give background information, but Dr. Jagdish's evaluations are devoid of an opinion that could be considered controlling or contradictory with respect to any one of the four functional limitations. (Tr. at 156-59, 176.) Furthermore, the ALJ did not ignore Dr. Jagdish's findings; rather, he reported plaintiff's memory problems not only in evaluations done by Dr. Jagdish, but also in evaluations done by Dr. Seldin, assessor Denise Valenti-Hein, and Dr. Werner. (*Id.* at 18-20.) The record shows that the ALJ considered the various reports of plaintiff's significant memory problems when determining that plaintiff could do simple, low-stress, and routine work. (*Id.* 22, 24.)

Plaintiff further argues that the ALJ ignored the regulatory definition of "marked" that is to be applied when determining the severity of functional limitations under the part B criteria. The regulatory definition reads:

> Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. 404.1520a, pt. 404, subpt. P, app. 1, § 12.00(C) (2006).

The regulations go on to note that "marked" is defined not by a specific number of different activities or behaviors in which functioning is impaired, "but by the nature and overall degree of interference with function." *Id.* This definition, by its very elasticity, reflects the fact that a

considerable degree of prudential judgment is typically involved in determining the severity of functional limitations. As noted above, this court will not reweigh evidence or substitute its own judgment for that of the Commissioner of Social Security. The record shows substantial evidence to support the ALJ's finding that none of plaintiff's four functional limitations was "marked." As to the first two functional limitation categories (daily activities and social functioning), the record shows that plaintiff could drive, had a paper route, contemplated getting a second route, worked out at the gym from four to seven times each week, and ran two times each week for exercise. (Tr. at 191-92, 158, 162-63, 165, 172-73, 175, 199.) He cooked, did the laundry, cleaned the house, drove by himself, went grocery shopping, lived with his father and sister, socialized with his father's friends and his own, dated, visited relatives, attended sporting events, and accompanied his father on his paper route. (*Id.* at 81, 83, 104, 106, 136, 162-63, 165, 175.) Plaintiff also went for walks, traveled alone, read, went to the library, went out to eat at restaurants, and went to the movies once a month. (*Id.* at 83, 104, 136, 162.) As to the third functional limitation,[2] the evidence on record regarding plaintiff's memory and concentration substantially supports the ALJ's finding that plaintiff was moderately limited as to concentration, persistence, and work pace. *See* discussion *supra*. The record contains substantial evidence, therefore, to support the ALJ's determination that none of plaintiff's functional limitations was "marked."

Plaintiff points to numerous impairments of plaintiff's daily activities, social functioning, and concentration, which are also evidenced in the record. But the test here is not the absence of any impairment. Furthermore, the ALJ, as the fact-finder, is the one to weigh the evidence, which includes, of course, evidence of plaintiff's functioning as well as evidence of plaintiff's

---

[2] Plaintiff has not contested the ALJ's finding that plaintiff experienced no extended episodes of decompensation (the fourth functional limitation).

16

impairments. *See Kelley v. Sullivan*, 890 F.2d 961, 964 (7th Cir. 1989) (recognizing that ALJ plays role of fact-finder in Social Security cases). Here, the ALJ found that the evidence showing plaintiff did not satisfy the "part B" criteria outweighed the evidence that he did. As substantial evidence in the record supports that finding, this court will not substitute its evaluation of the evidence for that of the ALJ.

## II. ALJ's Assessment of Plaintiff's Credibility

At the December 2004 hearing, the ALJ found plaintiff's testimony partially credible. Plaintiff argues that the ALJ failed to assess plaintiff's credibility properly. In support of this argument, plaintiff raises three points. First, plaintiff claims the ALJ failed to specify which portions of his testimony were credible. The relevant Social Security ruling provides:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 61 Fed. Reg. 34483-01, 34485-86 (1996). Contrary to plaintiff's argument, the regulations do not require the ALJ to specify which portions of the claimant's testimony he found credible. *See Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003) (ALJ's failure to specify which portions of claimant's testimony were incredible does not demonstrate that the ALJ's credibility finding is not supported by substantial evidence). Rather, the regulations require the ALJ to list and articulate his reasons—which, in turn, must be grounded in the evidence—with enough specificity to clarify the weight he gave to the claimant's statements and the reasons for that weight. The ALJ did give specific grounds for his credibility finding, namely, (1) the nearly eight-year gap between plaintiff's motorcycle accident and the lack of subsequent evidence of medical treatment in the

17

record until August 2003; (2) the specific findings of Dr. Seldin; (3) plaintiff's self-reported significant improvement with respect to his paranoid thoughts and spastic movements after Dr. Jagdish prescribed medication and adjusted the dosage; and (4) plaintiff's ability to continue with his paper route amid some continuing problems with memory and anxiety. (Tr. at 22.) After considering the objective evidence and claimant's testimony, the ALJ stated he could not find credible plaintiff's allegations that he was incapable of all work activity. (*Id.*) In light of the ALJ's specific citations to the record, this court finds no indication the ALJ failed to meet the regulatory standard here.

Second, plaintiff argues that in determining plaintiff was only partially credible, the ALJ relied on pre-2003 evidence rather than the existing medical record. However, the ALJ's articulated reasons for finding plaintiff partially credible are not limited to pre-2003 evidence. For example, the ALJ cited plaintiff's improvement under Dr. Jagdish's prescribed medication, plaintiff's ability to maintain a paper route amid his continuing problems with memory and anxiety, and the evaluations done by Dr. Seldin and at the Outagamie County Human Services Division. (Tr. at 22.) All of this evidence in the medical record comes from 2003 and later.

Third, plaintiff argues that the ALJ failed to explain any inconsistencies between plaintiff's lack of credibility regarding his limitations and the support provided plaintiff's testimony by the doctors' reports. Plaintiff does not articulate any of these alleged inconsistencies, apparently leaving it to the court to search for same. In response, this court notes several items. First, the credibility determination is left to the ALJ, not to the evaluating doctors. SSR 96-7p, 61 Fed. Reg. 34483-01 (1996). Furthermore, the ALJ's decision shows that in making his credibility determination he took account of the various medical and psychiatric evidence, including evidence of plaintiff's mental and physical limitations. *See* discussion *supra*. Most important, however, is that no doctor on

18

record indicated that plaintiff was incapable of all work activity. The ALJ's alleged failure to address any inconsistencies is moot, then, as this court finds no inconsistencies, and plaintiff has not specifically pointed to any.

Because the ALJ is in the best position to hear the witnesses and assess their forthrightness, his credibility determination is given special deference and will be reversed by a court only if the claimant can show it was "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (internal citation omitted). Substantial evidence in the record supports the ALJ's determination that plaintiff was not wholly credible. Because that determination was not "patently wrong," this court will not disturb it.

## III. Sufficiency of ALJ's Hypothetical Question

Finally, plaintiff argues the ALJ's hypothetical question failed to include all of plaintiff's limitations that were supported by the evidence, specifically, limitations involving his memory and paranoia that others are watching him. (Pl. Br. at 8-9.) Hypothetical questions posed to vocational experts "ordinarily must include all limitations supported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Plaintiff contends that the ALJ ignored the vocational expert's testimony that factored in such memory- and paranoia-related limitations (i.e., difficulty in finding the job site, in navigating about the job site, in getting supplies, and in working near other people). (Pl. Reply Br. at 4; Tr. at 204-06.) The ALJ asked the vocational expert only one hypothetical question, which included the limitations of work that was "simple, routine, unskilled" and devoid of any need to scale heights. (Tr. at 203.) The ALJ essentially phrased his hypothetical question in terms of his finding that plaintiff retains the residual functional capacity ("RFC") to perform "all exertional levels of work and is only limited to simple, low stress, routine work." (Tr. at 24.) Plaintiff claims this was error.

19

This argument is nothing more than a further attack on the ALJ's credibility determination. Plaintiff claims that the ALJ's hypothetical was deficient because it did not include all of the functional limitations he testified to at the hearing. But the ALJ found plaintiff's testimony less than fully credible and concluded that he retained a "residual functional capacity for all exertional levels of work and is only limited to simple, low stress, routine work." (Tr. at 21-22.) Plaintiff's RFC was further narrowed to exclude work at heights and around dangerous machines. (Tr. at 203.) Assuming this RFC, the Vocational Expert opined that there were a significant number of jobs in the national economy that plaintiff could perform. (Tr. at 25.)

I have already concluded that the ALJ's assessment of plaintiff's credibility was sufficiently articulated and grounded in the evidence in the record. There is no need to repeat that entire discussion here. Suffice it to say that the ALJ's RFC finding adequately accounted for plaintiff's limitations that were supported by the evidentiary record. Plaintiff's alleged difficulties in finding the job site and getting supplies are not supported by the record; in fact, they first appear in the record when plaintiff's representative included them in a hypothetical question she posed to the vocational expert. (Tr. at 204-05.) These limitations are also inconsistent with the facts that he is able to maintain a paper route and get himself to the gym most days of the week. The ALJ was not required, therefore, to include these limitations in his hypothetical question. And to the extent plaintiff's testimony that as a stock clerk at the Target Store in Arizona he experienced difficulty finding his way around the store is intended to suggest a further functional limitation, the ALJ clearly rejected it.

With respect to plaintiff's paranoia, it is clear from the ALJ's assessment of plaintiff's credibility that he did not accept the functional limitation plaintiff claimed this condition placed on him at the hearing. In his decision, the ALJ took note of the various reports of plaintiff's paranoia

20

(Tr. at 18-20), as well as Dr. Jagdish's later report that plaintiff's paranoia had significantly decreased through the use of medication, and the dosage was being increased with a hope of further improvement. (Tr. at 22, 174-75.) In this connection also, the ALJ noted plaintiff's ability to complete his paper route. (Tr. at 22.) Based on the record before me, I cannot say that the ALJ's hypothetical was flawed.

## CONCLUSION

For the above reasons, I find that the Commissioner's decision is supported by substantial evidence and is not otherwise in error. Accordingly, the Commissioner's decision is affirmed.

**SO ORDERED** this ___16th___ day of October, 2006.

                           s/ William C. Griesbach
                           William C. Griesbach
                           United States District Judge

21